## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

LISA MARQUEZ                :     Hon. Joseph H. Rodriguez

         : 

      *Plaintiff*,            :

         :     Civil No. 20-14631

      v.               :

         :     **OPINION**

UPSTAIRS AT CHEF VOLA, INC.; CHEF    :

VOLA, INC.; AND CHEF VOLA'S        :

MANAGEMENT COMPANY, LLC       :

         :

      *Defendant*.         :

Plaintiff Lisa Marquez ("Plaintiff") alleges that her former employer, Upstairs at Chef Vola, Inc. Chef Vola, Inc., and Chef Vola's Management Company, LLC (collectively "Defendants") improperly terminated Plaintiff's employment because of her chronic and acute injuries. Presently before the Court are cross-motions for summary judgment. [Dkt. 24, 26]. For the reasons set forth below, the Court will deny Plaintiff's motion, grant Defendants' motion in part, and deny Defendants' motion in part.

### I.   Background

Defendants are business entities that own a family-operated Italian restaurant in Atlantic City, New Jersey. The four family members who own the business are Louise and Michael ("Michael Sr.") Esposito, and their two sons Louis ("Albert") and Michael Jr. (collectively "the Owners"). [*E.g.* Louise Dep. Tr. 9:24–10:6]. Though the owners' roles were somewhat fluid, Michael Sr. handled the books, finances, and payroll, [*e.g.* Dkt. 24-4, Louise Dep. Tr. 21:2–22:18]; Albert handled reservations, managed the restaurant floor, and managed restaurant staff

during shifts, [*e.g.* Dkt. 24-4; Albert Dep. Tr. 26:13-18]; and Louise was responsible for personnel and baking.  [*E.g.* Dkt. 24-4, Louise Dep. Tr. 9:17-23].[1]

Plaintiff, who is now approximately sixty-one years old, worked for Defendants from February 2017 until August 9, 2019.  [Am. Compl. ¶¶ 1, 9, 23].[2]  Plaintiff started as a busser but became a server after four to six weeks.  [Dkt. 24-4, Pl. Dep. Tr. 26:19–27:24, 43:1–5].  Plaintiff typically worked five days per week.  [Am. Compl. ¶ 9].  Plaintiff's job primarily required her to memorize and recite the dinner and dessert menus to patrons, [*e.g.* Dkt. 24-4, Albert Dep. Tr. 47:2-19], enter dinner orders into an electronic system, [Dkt. 24-4, Albert Dep. Tr. 45:12–47:7], and occasionally deliver plates of food to tables, [Dkt. 24-4, Pl. Dep. Tr. 109:21–111:7].  The restaurant is divided into a downstairs dining room and an upstairs porch dining room.  Plaintiff worked primarily on the porch and typically divided responsibility for tables on the porch with another server, Mary.  [*See* Pl. Dep. Tr. 172:8–173:10].

Plaintiff's hours varied, and her summer and weekend shifts typically lasted longer than her offseason and weekday shifts, but Plaintiff generally arrived for her shifts around 4:00 p.m. and left between 10:30 p.m. and 11:30 p.m.  [Albert Dep. Tr. 65:23–66:5; Pl. Dep. Tr. 30:10–22].

---

[1] The record is unclear as to Michael Jr.'s role in operating the restaurant.

[2] Plaintiff's initial complaint [Dkt. 1] did not include Upstairs at Chef Vola, Inc. as a defendant. Plaintiff filed an amended complaint [Dkt. 18] (the "Amended Complaint") to add this entity as a defendant.  The initial complaint and Amended Complaint are otherwise identical.  The Court will refer to the Amended Complaint because it is the operative pleading.

### a. Tips and Wages

While Plaintiff was employed with Defendants, the restaurant required customers to pay for their meals and tip staff in cash.  [Pl's SUMF ¶ 43].[3]  At the end of their meals, patrons placed their food and tip payments into a box which changed hands until it made its way to the back of the restaurant, where Michael Sr. collected the money.  [Louise Dep. Tr. 21:22–22:14]. Michael Sr. then "pooled" the tip money collected each night, and later paid servers, food runners, and bussers a portion of the total tips collected each night.  [Michael Sr. Dep. Tr. 10:23– 11:1; 13:18–24].  The Owners used their discretion rather than fixed "percentages" to divide the tips among the tip pool participants.  [Michael Sr. Dep. Tr. 11:24–12:10, 16:12–15].  Michael Sr. divided the tips every night and paid workers weekly.  [Michael Sr. Dep. Tr. 12:11–13; 16:22– 17:1].  Plaintiff testified that, when she began working for Defendants, Michael Sr. explained to her that he would pool tips and decide how to disburse tips among employees.  [Pl. Dep. Tr. 31:7–32:20].

Before 2019, Defendants "reported" the tip money that they gathered, "paid taxes,"[4] and paid tipped employees in cash.  [Michael Sr. Dep. Tr. 18:19–21, 19:11].  However, in 2019, Defendants changed their practices after their accountant advised Defendants that they were paying more in taxes than necessary.  [Michael Sr. Dep. Tr. 18:13–21].  Defendants then began paying their employees with checks and no longer paid taxes on the tips.  [Michael Sr. Dep. Tr. 18:21–23].  Though Michael Sr. described this transition in his deposition, he also stated that he was following his accountant's instructions and that "I didn't quite understand it but, you know, I

---

[3] "SUMF" refers to statement of undisputed material facts that each party submitted along with its motion pursuant to Local Rule 56.1.

[4] It is unclear from the record evidence which taxes Defendants withheld and why.

did it.  We changed our system after 37 years of how we operated."  [Michael Sr. Dep. Tr. 19:2–7].

Despite this pooled tip arrangement, Plaintiff testified that she received $15.00 per hour when she began working as a busser.  [Pl. Dep. Tr. 26:19–22; 27:22].  When she began as a server, she was paid $125.00 per night.  Over time, her pay increased to $150.00 per night and again to $175.00 per night.  [Pl. Dep. Tr. 27:22– 28:2].  Consistent with Defendants' payment practices as described above, Plaintiff initially received her wages as cash payments and later received checks.  [Pl. Dep. Tr. 28:16–25].  Plaintiff testified that, when Defendants changed their payment practices, Plaintiff received "a significant increase [in pay] but our taxes were no longer going to be paid by [Defendants]."  [Pl. Dep. Tr. 160:3–5].

### b.  Plaintiff's Injuries and termination

In December 2018, Plaintiff experienced hand pain that made it difficult for her to carry plates.  [Pl. Dep. Tr. 121:8–13].  Plaintiff had issues with her hands before she began working for Defendants.  [Pl. Dep. Tr. 126:7–10].  Plaintiff visited a doctor who "thought" that Plaintiff had work-related carpal tunnel syndrome.  [Pl. Dep. Tr. 121:13–14].  Plaintiff called Louise, explained the situation, said that she did not have health insurance, and asked Louise for permission to file a workers' compensation claim to have surgery on her hands.  [Pl. Dep. Tr. 122:4–14].  Plaintiff understood that the restaurant would be closed for a Christmas holiday and sought to have the procedure during the closure.  [Pl. Dep. Tr. 121:23–122:3].  Louise encouraged Plaintiff to file the workers' compensation claim.  [Pl. Dep. Tr. 122:15–17; Louise Dep. Tr. 31:1–11].  Plaintiff filed the claim and Albert removed Plaintiff from the work schedule while her claim was pending.  [Pl. Dep. Tr. 124:17–125:8].

Defendants' workers' compensation insurance carrier denied the claim after determining that Plaintiff's hand injury was a pre-existing condition.  [Pl. Dep. Tr. 128:19–129:5].  Plaintiff was placed back on the work schedule on or around January 10, 2019.  [Pl. Dep. Tr. 137:16–20].  Plaintiff returned to work and wore braces on her hands.  Defendants were "on board" with the fact that Plaintiff would be unable to lift plates due to her hand condition and would need to be on "light duty" when she wore her braces.  [Pl. Dep. Tr. 139:13–17].  Plaintiff testified that, after returning to work, she did not discuss her carpal tunnel syndrome or her workers' compensation claim with the Owners again.  [Pl. Dep. Tr. 141:7–18].

Plaintiff testified that she spoke with Mary about her carpal tunnel syndrome and her need to be on light duty, but Mary was resentful and instructed bussers not to help Plaintiff clear dishes from tables.  [Pl. Dep. Tr. 141:19–23].  This caused tension between Plaintiff and Mary.  In or around the last week of July 2019, Plaintiff asked Albert to transfer her from the porch to the downstairs portion of the restaurant because it would be "easier."  [Pl. Dep. Tr. 145:21–25].  Plaintiff believed she would have more support downstairs because Mary would not be there to tell bussers not to assist Plaintiff with dishes, but testified that she did not inform Albert that Mary was interfering with bussers at that time.  [Pl. Dep. Tr. 145:21–146:10].

Then, while working on Saturday August 3, 2019, Plaintiff slipped and fell on the stairs of the restaurant ("the Fall").  [Dkt. 24-3, Pl. SUMF ¶ 4].  Plaintiff could not identify the reason for the Fall as there were no spills or other conditions that caused her to fall.  [Pl. Dep. Tr. 100:1–101:22].  Plaintiff grabbed a railing as she fell but her knee struck the steps.  [Pl. Dep. Tr. 98:1–11].  Plaintiff informed Albert that she fell after it occurred.  [Dkt. 24-3, Pl. SUMF ¶ 6].  Plaintiff returned to work but Mary offered to cover Plaintiff's restaurant closing obligations so

that Plaintiff could leave early.  [Pl. Dep. Tr. 115:8–12].  Albert called his mother to inform her that Plaintiff fell.  [Louise Dep. Tr. 52:7–9].

After the Fall, one of the Owners prepared and submitted a report of injury ("ROI") to Defendants' workers' compensation insurance carrier.  [Dkt. 24-4, Exh. G].  The ROI indicated that Plaintiff "tripped and fell forward injuring Cervical Spine, Right Shoulder, Right Wrist, and Lower Back."  [*Id.*].  Though "Michael J" signed the ROI as the preparer, it is not clear from the record who prepared the ROI or how the preparer obtained the information in the ROI.

Plaintiff reported to work the next day (August 4).  According to Plaintiff, she informed Louise near the end of her shift that she fell on the stairs the night before and that she was sore.  [Pl. Dep. Tr. 168:1–8].  Louise permitted Plaintiff to end her shift early to go home.  [Pl. Dep. Tr. 168:9–13].  Plaintiff did not work again until Tuesday, August 6, 2019.  [Pl. Dep. Tr. 169:5–6].  When Plaintiff arrived for her shift, she told Mary that she did not feel well due to swelling that resulted from the Fall.  [Pl. Dep. Tr. 169:5–13].  Mary became upset that Plaintiff did not "pull[] [her] weight" during that night's shift.  [Pl. Dep. Tr. 169:18–170:1; 174:18–24].  Near the end of dinner service, Plaintiff asked a busser to clear a table but Mary instructed the busser not to clear the table because Plaintiff had not done any work all night.  [Pl. Dep. Tr. 170:25–171:3].  Plaintiff then left the upstairs porch while patrons were still dining, approached Albert, explained that she was not feeling well, mentioned the dispute between Mary and herself, and asked to go home.  [Pl. Dep. Tr. 171:4–10].  However, Plaintiff did not explicitly refer to the Fall when she spoke to Albert.  [*See* Pl. Dep. Tr. 176:11–177:2].  Albert testified that Plaintiff stated "I'm not working with that woman anymore" when Plaintiff came down from the porch.  [Albert Dep. Tr. 70:16–18].  Albert also stated that he did not inquire into Plaintiff's dispute with Mary because he did not want to disrupt dinner services.  [Albert Dep. Tr. 61:1–6; 62:22–63:4].  Albert asked

6

Plaintiff to stay downstairs and recite the dessert options to the two remaining tables and sent

another, inexperienced server upstairs to replace Plaintiff.  [Pl. Dep. Tr. 175:23–176:3].  Plaintiff

explained the desserts as asked then left work for the night.  [Pl. Dep. Tr. 177:1–4].  Louise was

not present when these events unfolded, [Louise Dep. Tr. 71:20–22], but testified that Albert

called her that night to explain what happened.  [Louise Dep. Tr. 73:17–74:1].

The following day (August 7), Plaintiff visited her doctor who believed that Plaintiff

sprained her neck because of the Fall and advised her to take a few days off from work.  [Pl.

Dep. Tr. 177:11–178:3].  That day, Plaintiff began the following text message exchange with

Louise:

> [August 7, 2019]
>
> Plaintiff:  I just got a phone I didn't have your number I can't work tonight I hurt myself the other night when I fell on the stairs I'm going to see my doctor today
>
> Plaintiff:  He said return on Friday
>
> Louise:  Lisa I understand that you're not feeling well I'm very sorry I understand it's your two hands but you still could come in until the specials [sic] and make it easy for us because you know we're shorthanded you're not a team player Have a voice and you could tell the specials and you could tell the desert [sic] orders your [sic] are definitely not a team player!  I want a doctors [sic] not that you can't work and tell the specials and desert [sic] orders since we are short of help because Andrew is on vacation
>
> [August 8, 2019]
>
> Louise:  Hi Lisa did you get my message I hope your hand is feeling better.
>
> Louise:  Well have you thought about telling the specials and desserts ??????
>
> [August 9, 2019]
>
> Plaintiff:  I'm confused The last thing you said to me before you hung up the phone was find another job am I still employed at Chef Volas
>
> Plaintiff:  Am I to report tonight or are you terminated

Plaintiff:  Am I terminated

Louise:   I'm not going to start my day getting aggravated you aggravated me yesterday not going to happen again.  When you said you went downstairs to spite Mary so she'll have all the work because you didn't like the way she spoke to you and treated you .  I realized your [sic] not a team you didn't care about "chef "vola's and good service you only cared about your feelings .  So when you do things like that you hurt me .  So I told you go find another job even though I'm short handed and Andrew is on vacation this week I asked you last week please do me a favor and work this week and you can leave early two or three days and come in late two or three days .  I'm a team player you're not end of conversation I don't' want someone that's not a team player and wants to spite people .

Yes go find another job .  I'm truly sorry it ended this way I really liked you.

Louise:  your pay is $220 For Tuesday with the Tips .  You can pick it up tonight whenever you want Michael or Louis will have it for you.

[*See* Dkt. 24-4, Exh. F.  The Court will refer to this exchange in its entirety as the "Text Messages."  Consistent with the Text Messages, Louise and Albert testified that Louise terminated Plaintiff because she "abandoned her post" during dinner service in order to "spite" Mary and at the expense of customer service.  [Louise Dep. Tr. 71:23–73:3; Albert Dep. Tr. 61:7–17].

Plaintiff filed the present lawsuit alleging that Defendants terminated Plaintiff unlawfully and failed to pay Plaintiff properly.  [*See* Dkt. 1, 18].  Her Amended Complaint alleges wrongful termination in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et seq. (Count I); wrongful termination and disparate treatment in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12102 et seq. (Count II); retaliatory discharge in violation of the ADA (Count III); retaliatory discharge under the New Jersey Workers' Compensation Act ("WCA"), N.J. Rev. Stat. § 34:15-39.1 (Count IV); wrongful termination, disparate treatment, and retaliation in violation of the New Jersey Law Against Discrimination

N.J. Stat. Ann. § 10-5:1 et seq. (Count V); wrongful withholding of tips and non-payment of overtime in violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 207 et seq. (Count VI); and wrongful withholding of tips and non-payment of overtime in violation of the New Jersey Wage and Hour Law ("WHL"), N.J. Stat. Ann. § 12:56-3.5 et. seq. (Count VII).  The parties stipulated to the dismissal of Counts I and V.  [Dkt. 25].  The parties filed the present cross-motions for summary judgment.  [Dkt. 24, 26].

## II.    Jurisdiction

The Court has federal-question jurisdiction over Plaintiff's federal statutory claims under 28 U.S.C. § 1331, and supplemental jurisdiction over Plaintiff's state-law claims under 28 U.S.C. § 1367.

## III.   Standard of Review

A court will grant a motion for summary judgment if there is no genuine issue of material fact and if, viewing the facts in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law.  *Pearson v. Component Tech. Corp.*, 247 F.3d 471, 482 n.1 (3d Cir. 2001) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)); *accord* Fed. R. Civ. P. 56(c).  Thus, this Court will enter summary judgment only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).

An issue is "genuine" if supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit.  *Id.*  In determining whether a genuine issue of material fact

exists, the court must view the facts and all reasonable inferences drawn from those facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The moving party has the initial burden to demonstrate the absence of a genuine issue of material fact. *Celotex Corp*, 477 U.S. at 323. Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial. *Id.*; *Maidenbaum v. Bally's Park Place, Inc.*, 870 F. Supp. 1254, 1258 (D.N.J. 1994). Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party. *Anderson*, 477 U.S. at 256–57.

In deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249.

## IV.   Analysis

Defendants move for summary judgment on Count II (ADA discrimination), Count III (ADA retaliation), Count IV (workers' compensation retaliation), and Count VI (FLSA violation). [*See* Dkt. 26-1]. Plaintiff opposes Defendants' motion and cross moves for summary judgment on Counts IV and VI. [Dkt. 24-2; Dkt. 28-2]. The arguments concerning Counts II–IV are similar. For each of these counts, Plaintiff claims that Defendants fired Plaintiff for an unlawful purpose related to Plaintiff's carpal tunnel syndrome and/or the injuries suffered due to the Fall. Defendants maintain for each count that that they fired Plaintiff because she "abandoned her post" on August 6 following the dispute with Mary and without regard for the

impact that her departure would have on customer service.  The Court will apply this general framework to Plaintiff's legal theories in the sections that follow.

### a.  ADA Discrimination (Count II)

Count II of Plaintiff's Amended Complaint alleges that Defendants violated the ADA's antidiscrimination provision by terminating Plaintiff's employment because of her disabilities, namely, carpal tunnel syndrome and the injuries suffered due to the Fall.  Defendants move for summary judgment on Plaintiff's ADA discrimination claim arguing that they terminated Plaintiff because she left the porch in the middle of her shift on August 6.  [Dkt. 26-1 at 8–11].

"The ADA provides that '[n]o covered entity[5] shall discriminate against a qualified individual on the basis of disability in regard to ... [the] discharge of employees ... and other terms, conditions, and privileges of employment.'"  *Stouch v. Twp. Of Irvington*, 354 F. App'x 660, 666 (3d Cir. 2009) (quoting 42 U.S.C. § 12112(a)).  To establish a *prima facie* case for ADA discrimination, a party must show:

> (1) the employee was handicapped; (2) the employee was otherwise qualified to perform the essential functions of the job and was performing them at a level that met the employer's expectations; (3) the employee suffered an adverse employment action because of the disability; and (4) the employer thereafter sought a similarly qualified individual for the job.

*Guarneri v. Buckeye Pipe Line Servs. Co.*, 205 F. Supp. 3d 606, 614 (D.N.J. 2016) (citing *Joseph v. N.J. Transit Rail Operations Inc.*, 586 Fed. App'x. 890, 892 (3d Cir. 2014)).  "Once a plaintiff establishes a prima facie case, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment action."  *Stouch*, 354 F. App'x at 666 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1973)).

---

[5] Defendants do not dispute that they are a "covered entity" for the purposes of the ADA.

"The plaintiff then bears the burden of establishing that this proffered reason is a pretext for discrimination." *Id.* To do so, a "plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994) (citation omitted). "[T]he non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence, and hence infer that the employer did not act for [the asserted] non-discriminatory reasons." *Id.* at 765 (citations and quotations omitted). At bottom, a plaintiff must show that the allegedly innocent reason for termination "was either a *post hoc* fabrication or otherwise did not actually motivate the employment action." *Id.* at 764 (citations omitted).

Defendants do not specify whether their motion attacks Plaintiff's ability to establish a *prima facie* case or pretext. On one hand, Defendants appear to argue that Plaintiff cannot establish a *prima facie* case because she lacks evidence to show that she was terminated "because of" her disability.[6] [Dkt. 26-1 at 9]. On the other, Defendants argue against pretext by reciting evidence of a legitimate non-discriminatory reason for Plaintiff's discharge. [*Id.* at 9–11]. Defendants focus more on their legitimate reason for terminating Plaintiff rather than Plaintiff's absence of evidence of a causal connection. The Court will therefore assume without

---

[6] Defendants do not refer to the burden-shifting scheme that applies to ADA discrimination claims and do not argue that Plaintiff cannot show that Defendants' lawful basis for Plaintiff's termination is mere pretext.

deciding that Plaintiff has established her *prima facie* case and consider Defendants' position as an argument in favor of a legitimate non-discriminatory reason and against pretext.

According to Defendants, the decision to terminate Plaintiff "had nothing to do with any claim of injury, but instead was a direct function of the plaintiff abandoning her job position and leaving the porch unable to serve" remaining patrons.  [Dkt. 26-1 at 11].  Defendants point out that Plaintiff asked to be transferred from the porch to the downstairs dining room due to ongoing conflict with Mary even before the Fall.  [Dkt. 26-1 at 10].  Defendants claim that Plaintiff renewed this request on August 6, when Plaintiff requested a move primarily so that Plaintiff could spite Mary for her hostility, and not because of any injury.  [*See* Albert Dep. Tr. 70:16–18].  Defendants accommodated that request instead of disrupting dinner service.  [*See* [Albert Dep. Tr. 61:1–6; 62:22–63:4].  Defendants also point out that there was no dispute that the family had previously accommodated Plaintiff's carpal tunnel issues and that, even after the Fall, Plaintiff finished her shift that evening and worked the next two shifts.  [Dkt. 26-1 at 9].  Against this backdrop, Defendants argue that no juror could find that Defendants terminated Plaintiff because of her disability.

Plaintiff responds that Defendants' proffered reason for Plaintiff's termination—that Plaintiff abandoned her post on August 6—is pretextual.  Plaintiff argues principally that Defendants have offered inconsistent explanations for their decision to terminate Plaintiff.  [Dkt. 28-2 at 8].  To support this contention Plaintiff first claims that Louise did not refer to Plaintiff "abandoning her post" in the text messages where Louise fired Plaintiff, but only referred to Plaintiff's refusal to report to work that day.  [Dkt. 28-2 at 8].  But this position is factually inaccurate.  Louise's August 9 text messages to Plaintiff—where Louise told Plaintiff not to

return to work—did refer to the August 6 incident where Plaintiff left her post.  [*See* Dkt. 24-4 at 145, Exh. F at 4].

      Plaintiff further points out that Louise terminated Plaintiff, but Louise was not present at the restaurant on August 6 when Plaintiff "abandoned her post."  [Dkt. 28-2 at 7].  Albert was present but did not terminate Plaintiff on the spot when Plaintiff left the porch.  [*Id.*].  But Louise testified that Albert told her what happened that night, [Louise Dep. Tr. 73:17–74:1], and Plaintiff offers no evidence to rebut this testimony.  Thus, the fact that Louise did not witness the August 6 incident does not mean that Louise was unaware of the August 6 incident.  Moreover, the record contains unrebutted testimony that Louise made decisions to hire and fire employees as well as Albert.  [Albert Dep. Tr. 24:22–23].  Thus, Louise not being present and Albert's decision not to terminate Plaintiff during dinner service on August 6 do not suggest inconsistency in Defendants' reason for terminating Plaintiff later that week.

      Plaintiff also argues that an inconsistency as to whether Defendants terminated Plaintiff because she abandoned her post on August 6 or refused to return to work later that week creates a fact issue worthy of juror consideration.  [Dkt. 28-2 at 7–8].  But both justifications for Plaintiff's termination at the heart of this alleged inconsistency concern Plaintiff's refusal to fulfill her duties as a server.  The Text Messages refer both to Plaintiff leaving her post and Plaintiff's refusal to report to work that week.  [*See* Dkt. 24-4 at 145, Exh. F].  Thus, even if the evidence that Plaintiff cites reveals an inconsistency as to which instance of Plaintiff's refusal to perform her duties motivated Defendants' decision to terminate Plaintiff, Plaintiff does not explain how this inconsistency could lead a "reasonable factfinder rationally find [these explanations] unworthy of credence."  *Fuentes*, 32 F.3d at 765.  Put differently, the Court does not see how a discrepancy over whether Defendants terminated Plaintiff because she abandoned

her post on August 6 or refused to work later that week permits an inference that Defendants discriminated against Plaintiff because of a disability.  To the extent that the evidence suggests that Plaintiff was terminated for requesting time off to nurse an injury suffered on the job, that evidence is properly considered in the context of Plaintiff's ADA retaliation claim discussed below.

Plaintiff also argues that contemporaneous statements and deposition testimony provide evidence of Defendants' discriminatory intent as to Plaintiff's carpal tunnel syndrome.  Plaintiff cites Louise's August 7 text message where Louise stated

> Lisa I understand that you're not feeling well I'm very sorry I understand it's your two hands but you still could come in until (sic) the specials and make it easy for us because you know we're shorthanded you're not a team player [sic] Have a voice and you could tell the specials and you could tell the desert [sic] orders you are definitely not a team player.

[Dkt. 24-4, Exh. F at 2].  Plaintiff also cites Albert's deposition testimony, where he referred to Plaintiff's hand injury, stating: "So there were some issues and, you know, I liked having her on the floor with her personality, but I didn't like the issues that she kept asking me and badgering me is what it became over issues with her hands."  [Albert Dep. Tr. 43:19–23].  Plaintiff argues that this evidence suggests that Defendants discharged Plaintiff because of her carpal tunnel syndrome.

The Court finds that this evidence is sufficient to create an issue of fact as to whether Defendants' proffered reason for discharging Plaintiff was pretextual.  The Court agrees with Defendants that the record is replete with evidence that Defendants attempted to accommodate Plaintiff's hand injury and even encouraged Plaintiff to file a workers' compensation claim for her hand injury.  [Dkt. 26-1 at 11–13].  But the jury must weigh that evidence against the statements by Louise and Albert to determine whether Plaintiff's carpal tunnel syndrome was a

"motivating factor" in Defendants' decision to discharge Plaintiff. *Jackson v. Trump Ent. Resorts, Inc.*, 149 F. Supp. 3d 502, 508 (D.N.J. 2015) (citing *Waldron v. SL Indus., Inc.*, 56 F.3d 491, 494–95 (3d Cir. 1995)); *see also Williams v. Philadelphia Hous. Auth. Police Dep't*, 380 F.3d 751, 771 (3d Cir. 2004) ("[T]he question of whether a proposed accommodation is reasonable is a question of fact.") (alteration in original) (citations and quotations omitted). Moreover, Defendants rely primarily on witness testimony, and jurors must assess witness credibility rather than the Court. *Anyclo Int'l Inc. v. Cha*, No. 318CV05759PGSLHG, 2022 WL 1241307, at *2 (D.N.J. Apr. 27, 2022) (*Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007)). The Court will therefore deny Defendants' summary judgment motion on this issue.

### b.  ADA Retaliation (Count III)

Defendants next move for summary judgment on Plaintiff's claim for retaliation under the ADA.  [Dkt. 26-1 at 11].  "To establish a prima facie case of retaliation under the ADA, a plaintiff must show: (1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action." *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 500 (3d Cir. 1997) (citations omitted).  From there, ADA retaliation claims follow the same burden-shifting scheme as ADA discrimination claims described above. *See id.* at 500–01.

Here, too, it is unclear whether Defendants argue that Plaintiff cannot establish the causation element of her *prima facie* case or that she lacks evidence that Defendant's stated reason for Plaintiff's termination was pretextual.[7]  Either way, fact issues preclude the Court

---

[7] Defendants do not dispute that Plaintiff engaged in protected activity when she requested time off from work due to her injury, or that an adverse action followed when Defendants terminated Plaintiff's employment. *See Davis v. Davis Auto, Inc.*, 509 F. App'x 161, 163 (3d Cir. 2013)

from granting Defendants' summary judgment motion on this claim.  Louise terminated Plaintiff

during a conversation where Plaintiff requested time off to tend to injuries suffered from the Fall.

[Dkt. 24-4 at 142–46; Pl's Exh. F at 1–4].  Because of the timing and context of this

conversation, a juror could find a causal connection between Plaintiff's request for time off and

her termination.  *See Williams*, 380 F.3d at 760 ("We have held in the ADA retaliation context

that 'temporal proximity between the protected activity and the termination [can be itself]

sufficient to establish a causal link.'" (quoting *Shellenberger v. Summit Bancorp, Inc.*, 318 F.3d

183, 189 (3d Cir. 2003)).  Defendants' arguments to the contrary ask the Court to interpret the

facts of this case differently.  [*E.g.* Dkt. 26-1 at 12 ("The context of those text messages and

more importantly the Plaintiff's own admissions, defy any reasonable construction of a

termination for disability….")].  But jurors must decide these fact issues, not the Court.  Further,

Defendants' position again relies primarily on witness testimony, and jurors must weigh witness

credibility on this issue as well.  *Anyclo Int'l*, 2022 WL 1241307, at *2.  The Court will therefore

deny Defendants' summary judgment motion on this issue.

### c.  Workers' Compensation Act Retaliation (Count IV)

Count IV alleges that Defendants retaliated against Plaintiff for asserting her workers'

compensation rights in connection with her carpal tunnel syndrome and injuries suffered from

the Fall.  Plaintiff and Defendants cross-move for summary judgment on this claim.  [Dkt. 24-2

at 5; Dkt. 26-1 at 13–14].  As explained below, the Court will grant's Defendants' motion with

respect to Plaintiff's workers' compensation claim based on her carpal tunnel syndrome.

---

(assuming along with the parties that a request for time off to tend to illness constitutes a
protected activity).

However, fact issues require the Court to deny both motions with respect to a workers'
compensation claim for injuries suffered due to the Fall.

New Jersey's WCA provides that "[i]t shall be unlawful for any employer or his duly
authorized agent to discharge or in any other manner discriminate against an employee as to his
employment because such employee has claimed or attempted to claim workmen's compensation
benefits from such employer."  N.J. Stat. Ann. § 34:15-39.1.  This statute also guarantees
"medical treatment and limited compensation without regard to the negligence of the employer"
to "employees injured in the workplace."  *Vitale v. Schering-Plough Corp.*, 174 A.3d 973, 982
(N.J. 2017) (quoting *Estate of Kotsovska ex rel. Kotsovska v. Liebman*, 116 A.3d 1 (N.J. 2015)
and N.J. Stat. Ann. § 34:15–7).

To state a *prima facie* case for WCA retaliation, plaintiffs must show that they (1) "made
or attempted to make a claim for workers' compensation," and (2) they suffered an adverse
employment action "in retaliation for attempting to make that claim."  *Syder v. Express Servs.,
Inc.*, No. CV2011013KMESK, 2022 WL 577964, at *3 (D.N.J. Feb. 24, 2022) (citing
*Cerracchio v. Alden Leeds, Inc.*, 538 A.2d 1292, 1296 (N.J. Super. Ct. App. Div. 1988)).

With respect to Prong 1, "[a] plaintiff is 'not required to show that he physically filed a
claim petition,' but he must in some manner claim or attempt to claim his workers' compensation
benefits."  *Syder*, 2022 WL 577964, at *3 (quoting *Cerracchio*, 538 A.2d 1292 at 1296).  "The
plaintiff may also prove this element of the case by showing that he/she exercised a right
protected by the worker's compensation act," such as "attending [a] medical appointment for [a]
work-related injury" or requesting "time off with statutory compensation during a period of
temporary disability.  N.J. Automated Model Civil Jury Instruction 2.41, Worker's
Compensation Retaliation (citing *Carter v. AFG Indus., Inc.*, 782 A.2d 967, 970–71 (N.J. Super

Ct. App. Div. 2001) and *Galante v. Sandoz*, 483 A.2d 829, 829–30 (N.J. Super. Ct. App. Div. 1984)).  Prong 2 requires proof of an adverse employment action and a causal connection between the adverse action and the worker's claim for benefits.  *Syder*, 2022 WL 577964, at *4.

From there, retaliation claims follow the same burden-shifting analysis applied above. *See Morris v. Siemens Components, Inc.*, 928 F. Supp. 486, 493 (D.N.J. 1996) (citing *McDonnell Douglas*, 411 U.S. at 802–04).  Under this framework, a "defendant is entitled to summary judgment on a plaintiff's claim for retaliatory discharge if it can demonstrate that: (1) the plaintiff is unable to establish a prima facie case of retaliatory discharge; or (2) if plaintiff can establish a prima facie case, the plaintiff cannot produce sufficient evidence of pretext to rebut the defendant's asserted legitimate reason for discharge.  *Id.* (citing *Fuentes*, 32 F.3d at 764).

Here too, it is unclear whether Defendants attack Plaintiff's ability to establish a *prima facie* case or pretext, so the Court will assume without deciding that Plaintiff has met her *prima facie* case.

The Court begins its analysis with Plaintiff's retaliation claim based on her carpal tunnel syndrome.  There is no dispute that Plaintiff filed a workers' compensation insurance claim for her carpal tunnel syndrome on December 17, 2018.  [*See* Dkt. 24-2 at Pl's SUMF ¶¶ 28–31; Dkt. 26-2, Defs' SUMF ¶ 7].  However, and as Defendants argue, [Dkt. 26-1 at 13–14], Plaintiff fails to provide evidence of a causal connection between Plaintiff's December 2018 workers' compensation claim and her August 7, 2019 termination.  Plaintiff concedes that Louise permitted Plaintiff to file a workers' compensation claim for her carpal tunnel syndrome when the two discussed the issue in 2018.  [Pl. Dep. Tr. 122:15–17; Louise Dep. Tr. 31:1–11]; *see Rauch v. Drazin & Warshaw*, No. A-5445-05T5, 2008 WL 724126, at *6 (N.J. Super. Ct. App. Div. Mar. 19, 2008) (granting the defendant's motion for summary judgment in part because the

defendant attempted to contact a workers' compensation insurance carrier to ensure that the plaintiff received benefits).  There is no dispute that Plaintiff filed a claim and that Defendants' insurance company denied Plaintiff's claim after determining that Plaintiff's carpal tunnel syndrome resulted from a pre-existing condition.  [Pl. Dep. Tr. 128:19–129:5].  More than eight months elapsed between when Plaintiff filed her workers' compensation claim and her termination.  This eight-month gap precludes a causal connection between Plaintiff's workers' compensation claim and her termination.  *See Galante v. Sandoz, Inc.*, 470 A.2d 45, 47 (N.J. Super. Ct. Law. Div. 1983), *aff'd*, 483 A.2d 829 (N.J. Super. Ct. App. Div. 1984) (granting defendant's motion for summary judgment due in part to an eight-month gap between the plaintiff's workers' compensation claim and his termination).

Plaintiff's attempt to establish a causal connection by pointing to the Text Messages fails.  In the Text Messages, Louise mentions Plaintiff's carpal tunnel syndrome.  [Dkt. 24-2 at 9].  But the text messages do not refer to any workers' compensation claim that Plaintiff made or attempted to make in connection with her carpal tunnel syndrome.

Ultimately, there is no evidence of a causal connection between a workers' compensation claim for Plaintiff's carpal tunnel syndrome and her termination.  The Court will grant Defendants' motion for summary judgment with respect to a retaliation claim based on Plaintiff's carpal tunnel syndrome.

However, fact issues require the Court to deny the parties' cross-motions with respect to Plaintiff's retaliation claim based on injuries suffered because of the Fall.  Although Plaintiff did not file or attempt to file a formal claim for workers' compensation benefits, Plaintiff notified Louise that she visited a doctor for injuries suffered because of the Fall and sought to miss work due to those injuries.  [Dkt. 24-3, Pl's SUMF ¶¶ 15–16].  Under New Jersey law, these actions

and Defendants' notice of these actions permit an inference that Plaintiff filed or attempted to file a claim for workers' compensation. *See* N.J. Automated Model Civil Jury Instruction 2.41, *supra*. Louise terminated Plaintiff in the same conversation where Plaintiff provided this information concerning the Fall and her injuries. [*See* Dkt. 24-4, Exh. F]. These circumstances permit an inference that Plaintiff was terminated in retaliation for exercising her rights to workers' compensation under New Jersey law. *See Est. of Roach v. TRW, Inc.*, 754 A.2d 544, 551 (N.J. 2000) ("Examining whether a retaliatory motive existed, jurors may infer a causal connection based on the surrounding circumstances." (citing *Romano v. Brown & Williamson Tobacco Corp.*, 665 A.2d 1139 (N.J. Super. Ct. App. Div. 1995)). Further, only a few days elapsed between when Plaintiff suffered injuries from the Fall, notified Louise of her doctor's visit, and was terminated. This temporal proximity between the protected activity and Plaintiff's termination permits a causal inference. *See Syder*, 2022 WL 577964, at *4 ("The Third Circuit has held that gaps of two days or ten days were short enough to support a *prima facie* showing of causation." (citing *See Jalil v. Avdel Corp.*, 873 F.2d 701, 708 (3d Cir. 1989) and *Shellenberger*, 318 F.3d at 189).

As described above, Defendants support their argument that they terminated Plaintiff because she "abandoned her post" on August 6 with deposition testimony of Louise and Albert, and the Text Messages. A jury must weigh this evidence to determine which side prevails. *See Anyclo Int'l*, 2022 WL 1241307, at *2. The Court will therefore deny both motions for summary judgment with respect to Plaintiff's WCA retaliation claim based on injuries suffered due to the Fall.

### d.  Fair Labor Standards Act Claim (Count VI)

Plaintiff moves for summary judgment on her claim that Defendant violated FLSA laws and regulations concerning the receipt and distribution of tips to Plaintiff and other tipped employees.[8]  [Dkt. 24-2 at 11].  Defendants cross-move for summary judgment on this same issue arguing that the undisputed evidence shows that Defendants complied with all FLSA laws and regulations because Defendants paid Plaintiff more than minimum wage.[9]  [Dkt. 26-1 at 14–15].  As discussed below, Plaintiff fails to meet her initial summary judgment burden to establish the lack of a factual dispute over Defendants' FLSA compliance, and Defendants' argument is legally inaccurate.  The Court will therefore deny both motions.

The FLSA establishes a $7.25 minimum average hourly wage that an employer must pay to its employees.[10]  *See* 29 U.S.C. § 206(a).  But under 29 U.S.C. § 203(m), an employer may "reduce a tipped employee's wage below the statutory minimum by an amount to be made up in tips."[11]  *Reich v. Chez Robert, Inc.*, 28 F.3d 401, 403 (3d Cir. 1994).  This is known as a "tip credit."  *See id.*  "The amount of the tip credit is the difference between the worker's wage per hour and the minimum wage pursuant to 29 U.S.C.§ 206 of 7.25 per hour."  *Acosta v. A.C.E. Rest. Grp., Inc.*, No. CV 15-7149, 2017 WL 2539387, at *3 (D.N.J. June 12, 2017) (Rodriguez,

_____

[8] Plaintiff does not move for summary judgment with respect to her allegation that Defendants failed to compensate her for overtime work.

[9] Defendants appear not to move for summary judgment on Plaintiff's overtime claims.

[10] This hourly average wage "is determined by calculating [a worker's] 'regular rate:' Whatever the employee's payment method (e.g., piece-rate, salary, commission), the regular rate will be computed 'by dividing his total remuneration for employment ... in any workweek by the total number of hours actually worked by him in that workweek for which such compensation was paid.'"  *Rui Tong v. Henderson Kitchen Inc.*, No. CV 17-1073, 2018 WL 4961622, at *3 (E.D. Pa. Oct. 12, 2018) (quoting 29 C.F.R. § 778.109).

[11] "Tipped employees" are employees who "customarily and regularly receive[] more than $30 a month in tips."  29 U.S.C. § 203(t).

J.)  The amount paid in tips "may not exceed the value of the tips actually received by an employee."  29 U.S.C. § 203(m)(2)(A).

To take a tip credit, employers must comply with certain conditions.  The employee must have "been informed by the employer of the provisions of [§ 203(m)].  29 U.S.C. § 203(m)(2)(A).  "[A]ll tips received by such employee have been retained by the employee, except that this subsection shall not be construed to prohibit the pooling of tips among employees who customarily and regularly receive tips."  *Id.*  Further, "[a]n employer may not keep tips received by its employees for any purposes, including allowing managers or supervisors to keep any portion of employees' tips, regardless of whether or not the employer takes a tip credit."  *Id.* § 203(m)(2)(B).

Employers may take a tip credit where the employer "operates a valid 'tip pool,'" even if employees do not "retain" all of the tips that they "receive."  *Berger v. Perry's Steakhouse of Ill., LLC*, 430 F. Supp. 3d 397, 404 (N.D. Ill. 2019) (citing 29 U.S.C. § 203(m)).  "In a tip pool, a portion of an employee's tips are redistributed to other employees who perform customer service functions, such as bussers, bartenders and food runners."  *Id.*  A tip pool is only valid where the tip pool "is limited to employees who customarily and regularly receive tips," and where the employer does not "receive tips from such a tip pool" or "allow managers and supervisors to receive tips from the tip pool."  29 C.F.R. § 531.54(c)(1)–(3); *Berger*, 430 F. Supp. 3d at 404.  The employer "may only take a tip credit for the amount of tips each employee ultimately receives, and may not retain any of the employees' tips for any other purpose."  29 C.F.R. § 531.54(c)(2).  "If the tip pool is invalid … the employer may not take the tip credit, and must instead pay minimum wage."  *Berger*, 430 F. Supp. 3d at 404.

23

This legal overview demonstrates that Defendants' argument for summary judgment is legally inaccurate.  Again, Defendants claim that they cannot be liable for FLSA violations because Plaintiff received hourly wages and tips that combined to exceed the federal hourly minimum wage.  [Dkt. 26-1 at 14–15].  Relatedly, Defendants claim that their compliance with the FLSA's conditions for taking a tip credit and operating a tip pool are irrelevant because Plaintiff received more than the FLSA's hourly minimum wage, regardless of whether those wages came by way of tips or an hourly wage.  [Dkt. 26-1 at 15].  But to be eligible to take a tip credit and pay an hourly wage less than minimum wage, an employer must satisfy the conditions set forth in 29 U.S.C. § 203(m)(2).  *See Reich*, 28 F.3d at 403 (holding that "no tip credit can be taken and the employer is liable for the full minimum-wage" where an employer fails to satisfy §203(m)'s conditions (citing *Martin v. Tango's Rest., Inc.*, 969 F.2d 1319, 1322–23 (1st Cir. 1992))).  Thus, the fact that Plaintiff's income may have exceeded the FLSA's minimum wage does not alleviate Defendants of their obligation to pay minimum wage if Defendants did not comply with § 203(m)(2)'s conditions.  Because Defendants' summary judgment argument assumes otherwise, the Court rejects this position and will deny Defendants' motion.

Plaintiff argues that Defendants violated the FLSA because Defendants operated a tip pool but failed to properly notify Plaintiff of the details of the tip pool, treated tipped employees' tips as their own, improperly participated in the tip pool, and did not maintain adequate records of tip payments.  [Dkt. 24-2 at 13–14].  The Court will address each of these arguments in turn.

Plaintiff's notice argument appears to focus on notice about the tip pool specifically rather than notice that Defendants were taking a tip credit more generally.  Plaintiff cites her deposition where she testified that she was aware that tips were pooled but did not know how much money in tips she or any other employee contributed to the tip pool or how Defendants

divided the pooled tips among employees.  [Dkt. 24-2 at 13; SUMF ¶ 40].  She also cites

Michael Sr.'s testimony that Defendants divided tips based on their discretion and evaluation of

a worker's performance rather than a pre-set formula.  [Dkt. 24-2 at 13; SUMF ¶ 52].

Plaintiff fails to carry her initial burden of establishing an absence of a material fact

dispute on this issue.  *See Celotex Corp*, 477 U.S. at 323.  At most, the evidence cited suggests

that Plaintiff knew that all of her tips would be pooled but that she did not know how Defendants

decided to divide tips among employees each day or pay period.  When construing this evidence

in a light most favorable to Defendants, as the Court must when reviewing Plaintiff's argument,

*Boyle v. Cnty. of Allegheny*, 139 F.3d 386, 393 (3d Cir. 1998), Plaintiff's knowledge that all of

her tips would be pooled does not, without more, permit an inference that Defendants failed to

notify Plaintiff of the tip pool.  Moreover, in the Court's view, an employer can satisfy its

obligation under 29 C.F.R. § 531.54(c)(2) to "notify its employees of any required tip pool

contribution amount" if it notifies employees that all of their tips will be pooled.[12]  Further,

nothing in 29 C.F.R. § 531.54 or other FLSA regulations requires employers to use a particular

methodology when dividing pooled tips, notify employees of their method for distributing

pooled tips, or explain to employees how the employer distributed tips each pay period.[13]  Thus,

---

[12] Finding otherwise would require employers operating a tip pool to track and disclose to each
employee the amount of tips that employee received each shift and that were contributed to the
tip pool.  The Court's research did not identify any FLSA statute or regulation that imposes such
a requirement.

[13] *See Trinidad v. Pret A Manger (USA) Ltd.*, 962 F. Supp. 2d 545, 562 (S.D.N.Y. 2013) ("By its
terms, Section 203(m) imposes conditions on tip-pooling arrangements as a means of vindicating
the FLSA's minimum wage requirement.  It is not plausibly read to impose a nationwide
freestanding code of conduct regarding the handling of tip money…. Had Congress intended to
federalize tipping practices—i.e., to mandate generally that tips are the property of the employee
absent a valid tip pool—it could and presumably would have expressed this intention without
keying the tip-pooling requirements to the tip credit.").

if Defendants notified Plaintiff that all of her tips would be pooled, Defendants would have met their obligation.  Plaintiff does not cite any evidence to suggest that Defendants' notice efforts fell short.

Next, Plaintiff argues that the Owners "were directly involved in the tip pool, which is prohibited."  [Dkt. 24-2 at 13].  To support this argument Plaintiff cites 29 C.F.R. § 531.54(c)(3), which Plaintiff purports to say "[a]n employer may not participate in such a tip pool…."  [*Id.*].  Plaintiff misquotes § 531.54(c)(3), which states: "[a]n employer may not receive tips from such a tip pool and may not allow managers and supervisors to receive tips from the tip pool."  Nothing in this regulation prohibits employers from facilitating a tip pool by gathering and dividing tips.  To the contrary, FLSA regulations permit employers to facilitate tip pools.  *See* 29 C.F.R. § 531.54(b)(2) ("An employer that facilitates tip pooling by collecting and redistributing employees' tips does not violate [29 U.S.C. § 203(m)(2)(B)'s] prohibition against keeping tips….").  Thus, the Court rejects Plaintiff's claim that it was improper for the Owners to collect and redistribute tips.

Plaintiff next contends that Defendants improperly included managers in the tip pool and used tip pool money for other business purposes such as paying taxes.  [Dkt. 24-2 at 13].  To support this position, Plaintiff cites a portion of Michael Sr.'s deposition where he explained Defendants' change in payroll practices.  [Dkt. 24-2 at 136, Michael Sr. Dep. Tr. 18:3–19:22].  Michael testified that, under their previous practices, Defendants reported tips as income and, before redistributing that money to the employees, withheld "salary payroll taxes" on those earnings.  Based on this testimony, Plaintiff claims that Defendants used tip pool money improperly to "pay taxes."

Here too, the Court finds that Plaintiff fails to meet her burden of establishing an undisputed material fact on this issue.  Plaintiff fails to provide any evidence that the Owners unlawfully "kept" any tip money for themselves personally.  It is also far from clear from this testimony that Defendants improperly used tips to pay for Defendants' business operating expenses and not to comply with state and federal tax laws governing income tax withholdings. Plaintiff herself testified that the taxes withheld were income tax withholdings.  [Pl. Dep. Tr. 160:3–5 (testifying that when Defendants changed their payment practices, Plaintiff was "given a significant increase but our taxes were no longer going to be paid by [Defendants].").  Further, Plaintiff takes portions of Michael Sr.'s deposition testimony out of its full context.  Immediately after testifying about using tips to pay taxes, Michael testified that he "didn't quite understand" the change in payroll practices or how taxes were calculated and withheld."  [Michael Sr. Dep. Tr. 18:13–19:7].  Michael Sr. also testified that he separated tips from food payments and determined how tips would be divided among employees every night.  [Michael Sr. Dep. Tr. 16:22–18:2].  Thus, Plaintiff fails to show even superficially that Defendants misappropriated employee tip funds and/or used tips for business expenses.

Finally, Plaintiff argues that Defendants failed to maintain adequate records of tips as required by 29 C.F.R. § 516.28(a), which provides:

> With respect to each tipped employee whose wages are determined pursuant to section 3(m) of the Act, the employer shall maintain and preserve payroll or other records containing all the information and data required in § 516.28(a) and, in addition, the following:
>
> > (1)      A symbol, letter or other notation placed on the pay records identifying each employee whose wage is determined in part by tips.
> >
> > (2)      Weekly or monthly amount reported by the employee, to the employer, of tips received (this may consist of reports made by the employees to the employer on IRS Form 4070).

(3)      Amount by which the wages of each tipped employee have been deemed to be increased by tips as determined by the employer (not in excess of the difference between $2.13 and the applicable minimum wage specified in section 6(a)(1) of the Act). The amount per hour which the employer takes as a tip credit shall be reported to the employee in writing each time it is changed from the amount per hour taken in the preceding week.

(4)      Hours worked each workday in any occupation in which the employee does not receive tips, and total daily or weekly straight-time payment made by the employer for such hours.

(5)      Hours worked each workday in occupations in which the employee receives tips, and total daily or weekly straight-time earnings for such hours.

The only evidence that Plaintiff cites to support this argument is a collection of weekly payroll statements for Plaintiff from January 10, 2018 to August 6, 2019.  [Dkt. 24-2 at 14 (citing Dkt. 24-4, Exh. J)].  The statements identify Plaintiff's name, the number of hours worked each week, the amount of "regular" hourly pay and cash tips that Plaintiff received each week, and the amount of state and federal income taxes withheld.

Again, the Court finds that Plaintiff has failed to carry her initial burden.  The Court does not see how this evidence shows that Defendants failed to maintain records consistent with § 516.28(a)'s requirements.  Rather, when construing inferences in favor of Defendants, this evidence suggests that Defendants properly identified tipped employees, tracked the tips that Plaintiff received through the tip pool, tracked the "regular" wages paid, and counted the hours worked as a tipped employee.

In sum, the Court finds that Plaintiff has failed to carry her initial burden of showing that there is no issue of fact to be resolved by a jury with respect to her FLSA claim at Count VI. The Court will therefore deny Plaintiff's motion on this issue.

### e.   New Jersey Wage and Hour Law (Count VII)

Plaintiff also moves for summary judgment on her WHL claim, which mirrors her FLSA claim.  "As a general matter … the FLSA and the NJWHL are interpreted in parallel because the NJWHL is patterned on the FLSA."  *Casco v. Ponzios RD, Inc.*, No. CV 16-2084 (RBK/JS), 2019 WL 1650084, at *7 (D.N.J. Apr. 17, 2019) (citing *Crisostomo v. Exclusive Detailing, Inc.*, 2010 WL 2640183, at *5 (D.N.J. June 28, 2010).  Plaintiff appears to agree, as she includes her FLSA and WHL arguments in the same section of her motion brief and cites WHL provisions interchangeably with FLSA provisions.  [Dkt. 24-2 at 11–14].  Plaintiff has not cited any legal distinctions between the WHL and FLSA that would lead the Court to reach a different conclusion on her WHL claim.  Consistent with the Court's ruling on Count VI, the Court will deny Plaintiff's motion for summary judgment on her WHL claim.

## V.   Conclusion

For the reasons stated above, the Court will deny Plaintiff's motion for summary judgment, and grant Defendant's motion in part and Deny Defendants' motion in part.  An appropriate order will follow.


June 23, 2022                                          /s/ Joseph H. Rodriguez

                                                      Hon. Joseph H. Rodriguez, USDJ